# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 79818-9-I |
| Respondent, | ) | |
| | ) | ORDER GRANTING MOTION |
| v. | ) | FOR RECONSIDERATION |
| | ) | AND WITHDRAWING AND |
| D'ANGELO A. SALOY, | ) | SUBSTITUTING OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

The respondent, State of Washington, has filed a motion for reconsideration of the opinion filed on December 28, 2020. The court has determined that the motion should be granted, and the opinion should be withdrawn and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the motion for reconsideration is granted; and it is further

ORDERED that the opinion filed on December 28, 2020 is withdrawn; and it is further

ORDERED that a substitute unpublished opinion shall be filed.

_Appelwick, J._

WE CONCUR:

_____        _____
                                    Judge Pro Tempore

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THE STATE OF WASHINGTON,

Respondent,

v.

D'ANGELO A. SALOY,

Appellant.

No. 79818-9-I

DIVISION ONE

UNPUBLISHED OPINION

APPELWICK, J. — Saloy appeals from the judgment and sentence entered at his resentencing. He contends that (1) his 41 year sentence constitutes a de facto life sentence, (2) the trial court misapprehended the requirements of Miller at resentencing, (3) RCW 9.94A.730(1) is unconstitutional under the Eighth Amendment and article I, section 14, (4) the court erred in placing the burden on Saloy to prove he was entitled to an exceptional sentence below the standard range, and (5) the court erred in imposing a $100 DNA collection fee, as his DNA had previously been collected. We affirm his sentence but remand to strike the DNA collection fee.

### FACTS

On October 31, 2008, in a drive-by shooting, D'Angelo Saloy shot two teenagers standing near the Garfield High School baseball fields. Quincy Coleman was killed, while Demario Clark sustained nonfatal injuries. Police could not identify the shooter at the scene. Eventually, several individuals interviewed by

Citations and pin cites are based on the Westlaw online version of the cited material.

police indicated Saloy had been claiming responsibility for the shooting. One individual said Saloy claimed the shooting was in retaliation for the shooting of a "South End" gang member. The victims, Coleman and Clark, were both self-professed members of Central District gangs. Saloy was 16 at the time of the shooting and a member of a South End gang. In 2008, he had lost multiple friends to gang violence.

On December 1, 2010, during a judicially authorized wire recording, Saloy confessed to a friend that he had fired the shots during the drive-by and disposed of the gun in Lake Washington.

In 2011, at the age of 19, Saloy was charged with several adult felonies. He pleaded guilty to possession of controlled substances, unlawful possession of a weapon, assault II, and unlawful possession of a firearm. In 2012, at the end of his sentence for those crimes, he was arrested and charged with murder and attempted murder stemming from the 2008 shooting.

In 2014, a jury convicted Saloy of first degree murder with a firearm and attempted first degree murder with a firearm. The trial court sentenced him to a standard range term of 712 months, or almost 60 years. On appeal, this court vacated his sentence and remanded for a new sentencing hearing on the grounds that his 712 month sentence constituted a de facto life sentence. State v. Saloy, no. 72467-3-I, slip. op. at 2 (Wash. Ct. App. Feb. 27, 2017) (unpublished), https://www.courts.wa.gov /opinions/pdf/724673.pdf. This court ordered the trial court to "consider the factors laid out in Miller and exercise its discretion to consider[] a sentence below the standard

adult range." Saloy, no. 72467-3-I, slip. op. at 32 (citing Miller v. Alabama, 567 U.S. 460, 471, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)).

On January 3-4, 2019, the trial court conducted an evidentiary hearing pursuant to Miller. The court stated the purpose of the hearing was to "to determine if there are substantial and compelling reasons to justify an exceptional sentence below the standard range in this matter." Defense presented evidence of Saloy's development since the initial hearing, such as exhibitions of remorse, obtaining his general educational development certificate, and participating in a Juneteenth ceremony in prison. The sentencing court resentenced Saloy to 41 years, a nearly 20 year reduction from his initial sentence.

Saloy appeals.

## DISCUSSION

We review a sentencing court's decision for clear abuse of discretion or misapplication of the law. State v. Corona, 164 Wn. App. 76, 78, 261 P.3d 680 (2011). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. Id. at 78-79. This standard is also violated where a trial court makes a reasonable decision but applies the wrong legal standard or bases its ruling on an erroneous view of the law. Thornock v. Lambo, 14 Wn. App. 2d 25, 31, 468 P.3d 1074 (2020). When we review whether a trial court applied an incorrect legal standard, we review de novo the choice of law and its application to the facts in the case. Corona, 164 Wn. App. at 79.

I. De Facto Life Sentence

Saloy asserts that the 41 year exceptional sentence imposed by the trial court at resentencing was an unconstitutional de facto life sentence.

An exceptional sentence must be reversed if the reasons for the sentence are not supported by the record or if they do not justify an exceptional sentence. RCW 9.94A.585(4)(a). If the reasons are supported by the record, and justify an exceptional sentence, then, to reverse an exceptional sentence, we must find "that the sentence imposed was clearly excessive or clearly too lenient." RCW 9.94A.585(4)(b). The length of an exceptional sentence should not be reversed as clearly excessive absent an abuse of discretion. State v. Ritchie, 126 Wn.2d 388, 392, 894 P.2d 1308 (1995) (emphasis omitted).

In June 2012, the United States Supreme Court held the Eighth Amendment ban on cruel and unusual punishment forbids mandatory life without parole sentences for juvenile offenders. Miller, 567 U.S. at 479. Our Supreme Court held "in the context of juvenile sentencing, article I, section 14 provides greater protection than the Eighth Amendment." State v. Bassett, 192 Wn.2d 67, 82, 428 P.3d 343 (2018).

In Ramos, our Supreme Court held there was no distinction between juveniles receiving a literal mandatory life sentence and those receiving a de facto mandatory life sentence. State v. Ramos, 187 Wn.2d 420, 437, 387 P.3d 650 (2017). Either will trigger the need for a Miller hearing to consider what role youthfulness played in their crime and the appropriateness of a life without parole sentence. Id. at 434. "If the juvenile proves by a preponderance of the evidence

that his or her crimes reflect transient immaturity, substantial and compelling reasons would necessarily justify an exceptional sentence below the standard range because a standard range sentence would be unconstitutional." Id. at 435

The court declined to give a bright-line rule regarding what length of sentence would constitute a de facto life sentence triggering the requirement of a Miller hearing. Ramos, 187 Wn.2d at 439. However, a sentence that "is the functional equivalent of a life sentence" is a de facto life sentence. See State v. Ronquillo, 190 Wn. App. 765, 775, 361 P.3d 779 (2015). This court has held a juvenile whose 51 year sentence contemplated his release at the age of 68 was a de facto life sentence. Id. His case was reversed and remanded for a resentencing with a Miller hearing. Id. at 785. At a Miller hearing, consideration must be given to the juvenile offender's "chronological age and its hallmarks," their "family and home environment," and "the circumstances of the homicide offense" including "peer pressure." Miller, 567 U.S. at 477.

In State v. Houston-Sconiers, our Supreme Court held that courts have discretion to depart from mandatory sentences for firearm enhancements, remanding a juvenile offender's convictions—which included a 31 year weapons enhancement—for resentencing. 188 Wn.2d 1,8, 21, 391 P.3d 409 (2017).

In 2018 this court held that the nearly 60 year sentence imposed on Saloy when he was age 22 was a de facto life sentence, requiring the sentence be vacated and a Miller hearing held before resentencing. Saloy, No. 72476-3-I, slip op. at 13. On resentencing, the trial court determined based on his criminal history and the nature of the offenses at issue, the standard range for the offenses was

5

612-776 months. The State initially asked in its resentencing memorandum for 612 months, the low-end of a standard sentence. It then revised its recommendation down to 41 years when the sentencing court reconvened for formal sentencing. In his resentencing memorandum, Saloy asked for a 20 year sentence, arguing this was close to the deal the State offered prior to trial.

The trial court determined after weighing the Miller factors that Saloy had demonstrated by a preponderance of the evidence that his crimes reflect transient immaturity and he was not in the rare category of incorrigible offenders. The court sentenced him to an exceptional range below the standard range, imposing a 41 year sentence. This sentence would entitle him to release about the age of 60.

In support of his argument that release at age 60 is a de facto life sentence, Saloy offers several studies demonstrating how his lifespan may be adversely impacted by demographic and environmental factors. He cites to a public health journal article arguing that the average Black man will live to the age of 72. Further, he cites another study arguing that individuals experiencing four or more adverse childhood experiences (ACEs) are more likely to die prematurely. His evidence does not demonstrate that he is likely to die before his release from prison. He argues that Ramos equates releasing a juvenile offender "after his most productive years" with a de facto life sentence. We do not agree. Instead, Ramos reasoned that de facto life sentences contradicted Miller because "[h]olding otherwise would effectively prohibit the sentencing court from considering the specific nature of the crime and the individual's culpability before sentencing a juvenile homicide offender to die in prison." 187 Wn.2d at 438-39.

6

We hold that Saloy's sentence does not constitute a de facto life sentence.

II. <u>Application of Miller Factors at Resentencing</u>

When determining whether a trial court applied an incorrect legal standard, we review de novo the choice of law and its application to the facts in the case. <u>Corona</u>, 164 Wn. App. at 79.

In <u>Ramos</u>, our Supreme Court held that, while not automatically entitled to an exceptional sentence below the standard range, juveniles facing a de facto or literal life without parole sentence are entitled to a <u>Miller</u> hearing. <u>Ramos</u>, 187 Wn.2d at 442-443. <u>Miller</u> went beyond banning juvenile life sentencing schemes, establishing an affirmative requirement that courts fully explore the impact of the defendant's juvenility on the sentence rendered. <u>Id.</u> at 443. <u>Miller</u> required that a sentencing court consider a juvenile offender's youth before determining that life without parole is a proportionate sentence. <u>Montgomery v. Louisiana</u>, ___ U.S. ___, 136 S. Ct. 718, 734, 193 L. Ed. 2d 599 (2016). <u>Miller</u> did not create highly specified requirements for how a sentencing court must consider the mitigating qualities of youth. <u>Id.</u> at 735.

The juvenile defendant has the burden of proving by the preponderance of evidence that their crimes demonstrate transient immaturity.[1] <u>Ramos</u>, 187 Wn. 2d

---

[1] The trial court held that "Saloy has the burden to prove by a preponderance of evidence that mitigating circumstances justify an exceptional sentence in this case." Saloy argues the trial court erred in doing so because it relied on <u>Ramos,</u> which considered this question only under the Eighth Amendment and not article I, section 14. <u>Ramos</u>, 187 Wn.2d at 445. He argued the burden should be on the State to prove beyond a reasonable doubt. <u>Gregg</u> forecloses this argument. <u>State v. Gregg</u>, ___ Wn.2d ___, 474 P.3d 539 (2020)

After briefing, an opinion was released in <u>Gregg</u>. In that case, our Supreme Court ruled "RCW 9.94A.535(1) placing the burden on juvenile defendants in adult

at 435. If they meet this burden, a standard sentence is unconstitutional and an exceptional sentence below the standard range is justified. Id. Here, the sentencing court considered testimony of psychiatrist Dr. Tye Hunter related to Saloy's substance abuse issues, neurodevelopmental disorders, and emotional neglect and abuse. It also considered how "juveniles in general are different from adults, and how those differences apply to the facts of this specific case." It concluded Saloy had met the burden of proving his crimes reflect transient immaturity and he was not in in the rare category of incorrigible offenders. It determined Saloy was entitled to an exceptional rather than standard range sentence. That determination is not at issue.

What is at issue is how the trial court decided the length of the exceptional sentence. Saloy argues that in this step the court misapplied the law in two ways. First, he argues the court incorrectly considered whether an adult defendant is entitled to an exceptional sentence instead of considering the incompetency associated with youth. Second, he argues the court did not consider impulsivity as a feature of youth, but instead, whether his actions demonstrated impulsivity.

To his first argument, Saloy asserts his refusal to consider a plea deal was evidence of his youthful incompetency. He argues the standard used by the trial court tracks RCW 10.77.010(15), the definition of competency. Saloy argues his Miller hearing should not have involved whether he was incompetent, but how the

court to prove mitigating circumstances is constitutional under article I, section 14 of our state constitution." Id. at *545.

We affirm the trial court's holding that Saloy had the burden to prove he was entitled to an exceptional sentence.

8

incompetency of youth applied. Whether Saloy was incompetent in his participation in proceedings was raised by Saloy in the evidence presented at the Miller hearing. In direct response to that testimony, the trial court's conclusions of law stated,

> 9. Neither Dr. Hunter's testimony and report nor any other evidence support a finding that the defendant was impaired by any cognitive or mental disorder to an extent that it rendered him incompetent to consider a plea, stand trial or to be sentenced. Dr. Hunter's testimony on this point was not credible.

The court simply did not find Dr. Hunter's testimony credible about whether Saloy was incompetent to accept or reject a plea. The competency standard applies in adult sentencing, and Saloy was sentenced as an adult. The case law does not preclude consideration of incompetency in a Miller hearing. And, application of the competency standard in a Miller hearing benefits a juvenile who is found incompetent under the standard. Consideration of competency under this statute does no harm. If the court determines, as it did here, that the juvenile is not incompetent under that statute, it is not the end of the inquiry. The consideration of Miller factors is unaffected and continues. The argument that this establishes, that the trial court applied the wrong standard, is without merit.

Saloy next argues the court erred in its consideration of his impulsivity as an inherent feature of his youth. He argues the standard used by the trial court tracks the language of RCW 9.94A.535(1)(e), which allows a trial court to consider capacity as a mitigating circumstance in sentencing. Saloy argues this constituted the court deciding his crimes were not impulsive. Instead, he asserts it should

have understood <u>Miller</u> to recognize juvenile brain science as concluding his actions were impulsive by the nature of his youthfulness.

He argues that "by focusing on the deliberateness with which [Saloy] acted, the trial court effectively created an exception under <u>Miller</u> for children who are convicted of any crime that requires planning or deliberation." He contends that instead "[a]cting with deliberation to engage in risk-taking behavior was a 'hallmark feature' of [Saloy's] youth, not a fact to be weighed against it." The trial court's failure to understand this he argues, constitutes a legal error requiring reversal.

The trial court's conclusion of law stated,

> 8. Neither Dr. Hunter's testimony and report nor other evidence support a finding that the defendant's capacity to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of the law was impaired at the time he committed these offenses. Dr. Hunter's testimony on this point was not credible.

This language is similar to the language on mitigating circumstances in RCW 9.94A.535(1)(e). But, the language does not signal the trial court applied the wrong standard. Dr. Hunter's testimony asserted he lacked capacity during the trial, at the time of evaluation, at a plea bargaining, and at sentencing. The trial court did not find the testimony on this point credible. Had the trial court concluded otherwise, the statutory standard might have provided an additional basis for leniency. Rejecting the evidence necessarily resulted in the standard of that statute having no application.

The sentencing court determined that it must weigh the <u>Miller</u> factors against the "deliberate, not impulsive" nature of his acts. Saloy argues that this is

error because impulsivity is a hallmark of youthful actions and implies that a finding to the contrary is impermissible. But, Miller and its progeny do not stand for the proposition that a juvenile cannot be sentenced as an adult. They do not hold that a juvenile cannot commit an intentional act. Nor do they assert that traditional notions of degrees of culpability based on mental state do not apply to sentencing of juveniles. Miller requires an inquiry into how certain facts and factors affected the juvenile and should be taken into account in mitigating a sentence, but it does not require the sentencing court to ignore the facts of the crimes. 567 U.S. at 489. It was not error for the trial court to consider the deliberate nature of Saloy's crimes.

The court expressly considered Saloy's youthfulness in its deliberation. Indeed, the court held that his crimes were related to his transient immaturity, reducing his sentence. The sentencing court directly indicated it had considered the evidence related to juvenile neuroscience. It found the psychological factors detailed by Dr. Hunter "contributed to his developmental immaturity that contributed to his criminal acts." It determined an exceptional sentence was warranted.

The trial court was aware of the low end of the standard range for Saloy's offenses. It was aware of the plea offer of 20 years that Saloy had rejected. It was aware of Saloy's ACE factors. It was also aware of the facts of the crime and postcrime behavior. It knew Saloy was recorded claiming to have come up with the plan for the drive-by shooting and bragging about the crime, he disposed of the weapon in Lake Washington, and harassed victim Clark on social media. The court did not find Dr. Hunter credible when he testified that Saloy's capacity to

11

appreciate the wrongfulness of his actions or to conform his conduct to the requirements of the law was impaired at the time he committed these offenses. The sentence imposed was near the middle of the range between the low end of the standard range sentence and the plea offer Saloy rejected.

The record does not support the claim that the trial court applied the wrong legal standards in determining the length of sentence. The record does not establish an abuse of discretion in how the Miller factors were applied in determining the length of sentence.

We affirm the trial court's sentence.

III. Constitutionality of RCW 9.94A.730(1)

In response to Miller, our legislature enacted second substitute senate bill (SSSB) 5064, which created an indeterminate aggravated first degree murder sentence for juveniles along with other statutes including RCW 9.94A.730. LAWS OF 2014, ch. 130, § 10; In re Pers. Restraint of McNeil, 181 Wn.2d 582, 586, 334 P.3d 548 (2014) (referring to SSSB 5065 as "the Miller fix"). The Miller court did not specify whether the ruling should apply retroactively. But, by 2014 Washington had passed Miller compliance legislation providing means to retroactively apply Miller through resentencing. See RCW 9.94A.730(1).).

RCW 9.94A.730(1) provides "[a]ny person convicted of one or more crimes committed prior to the person's eighteenth birthday may petition the indeterminate sentence review board for early release after serving no less than twenty years of total confinement." RCW 94A.9730 created a means for the State to remedy a

12

Miller violation by granting juvenile offenders parole eligibility. State v. Scott, 190 Wn. 2d 586, 596-97, 416 P.3d 1182 (2018).

Two years after the adoption of the Miller fix, the Supreme Court in Montgomery, announced that Miller was retroactive on state collateral review. Montgomery, 136 S. Ct. at 736. However, it held life without parole sentences imposed without Miller hearings may be remedied "by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." Id. at 736. But, in Ramos, our Supreme Court held that the availability of parole under RCW 9.94A.730(1) did not render the defendant's pending appeal moot. Ramos, 187 Wn.2d at 435-36. At the time of Ramos's second resentencing, RCW 9.94A.730 hadn't been enacted, and he was facing a de facto life sentence. Id. at 435. Thus, at that time, he would have been entitled to resentencing. Id.

However, a minor offender is disqualified from petitioning under RCW 9.94A.730(1) if "'convicted for any crime committed subsequent to the person's eighteenth birthday.'" Id. (quoting RCW 9.94A.730(1)). Saloy asserts for the first time on appeal that this exception to eligibility under RCW 9.94A.730(1) is unconstitutional.

This court reviews a statute's constitutionality de novo. State v. Hunley, 175 Wn.2d 901, 908, 287 P.3d 584 (2012). Statutes are presumed constitutional, and the party challenging the statute has the burden to prove otherwise beyond a reasonable doubt. Bassett, 192 Wn.2d at 77.

Montgomery held that consideration for parole was an appropriate substitute for resentencing, not that it was in addition to resentencing.

<u>Montgomery</u>, 136 S. Ct. at 736. No case has indicated to the contrary. This court previously acknowledged Saloy was de facto sentenced to life under his nearly 60 year sentence in part due to his ineligibility for review under RCW 9.94A.730(1). <u>Saloy</u>, no. 72467-3-I, slip. op. at 28 n.11. So, we granted him resentencing pursuant to a <u>Miller</u> hearing as a remedy. <u>Id.</u> Having been resentenced after his de facto life sentence was vacated, Saloy has no additional rights under RCW 9.94A.730(1).

Moreover, the statute restricts the ability of the indiscriminate sentencing review board to hear certain petitions. <u>Id.</u> It does not address the sentencing authority of the trial court. <u>Id.</u> The only manner in which that statute was implicated was that the court acknowledged "a standard range sentence in this case may be deemed unconstitutional" due to "the specific length of his standard range sentence based on his felony conviction history and his ineligibility to petition for early release pursuant to RCW 9.94A.730(1)." While he may have benefited from this observation, it cannot be fairly said that he was sentenced under RCW 9.94A.730(1).

An appellate court may refuse to entertain a claim of error not raised below. RAP 2.5(a). An exception exists for a claim of manifest error affecting a constitutional right, but the defendant must identify a constitutional error and show how the alleged error actually affected the defendant's rights. <u>State v. Grimes</u>, 165 Wn. App. 172, 180, 267 P.3d 454 (2011).

Saloy has not demonstrated manifest error. We decline to reach the constitutionality of the statute.

14

IV. <u>DNA Collection Fee Assessment</u>

Saloy argues the $100 DNA (deoxyribonucleic acid) collection fee should be stricken. RCW 43.43.754(1)(a) requires DNA collection from all individuals convicted of felonies or certain other crimes. Individuals sentenced for crimes specified in RCW 43.43.754 must pay a $100 DNA collection fee, unless their DNA was previously collected as a result of a prior conviction. RCW 43.43.7541; <u>State v. Catling</u>, 193 Wn.2d 252, 257-58, 438 P.3d 1174 (2019).

Here, Saloy asserts as a result of previous adult felony charges, he would have been required to provide a DNA sample prior to being charged in this case. In addition to his prior convictions, Saloy was also found indigent by the court.

The State concedes that striking the fee is required under <u>Ramirez</u>, consistent with its own records indicating Saloy's DNA had previously been collected. <u>State v. Ramirez</u>, 191 Wn.2d 732, 747, 426 P.3d 714 (2018).

We affirm Saloy's sentence and remand to strike the DNA collection fee.

_Appelwick, J._

WE CONCUR:

_____     _____
                                       Judge Pro Tempore

15